PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

DONALD R. BARBE,
              *Petitioner-Appellant,*

v.

THOMAS MCBRIDE, Warden; MOUNT
OLIVE CORRECTIONAL COMPLEX,
              *Respondents-Appellees.*

No. 06-7550

Appeal from the United States District Court
for the Northern District of West Virginia, at Wheeling.
Irene M. Keeley, Chief District Judge.
(5:04-cv-00053-IMK)

Argued: December 4, 2007

Decided: April 7, 2008

Before KING and SHEDD, Circuit Judges, and
Henry F. FLOYD, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed in part, vacated in part, and remanded by published opinion.
Judge King wrote the opinion, in which Judge Shedd and Judge Floyd
joined.

## COUNSEL

**ARGUED:** William Jacob Watkins, Jr., WOMBLE, CARLYLE,
SANDRIDGE & RICE, Greenville, South Carolina, for Appellant.
Robert David Goldberg, Assistant Attorney General, OFFICE OF

THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellees. **ON BRIEF:** Darrell V. McGraw, Jr., Attorney General, Charleston, West Virginia, for Appellees.

---

**OPINION**

KING, Circuit Judge:

Donald R. Barbe, after unsuccessfully seeking habeas corpus relief under 28 U.S.C. § 2254 in the Northern District of West Virginia, appeals from the district court's September 2005 dismissal of his petition. Barbe was convicted in 1999 in the Circuit Court of Ohio County, West Virginia, of eight counts of incest, sexual assault, and sexual abuse by a custodian, for offenses involving his granddaughter (J.M.) and one other victim.[1] Barbe was subsequently denied state habeas corpus relief. In his federal habeas corpus petition, Barbe contended, inter alia, that (1) he was deprived of his Sixth Amendment right to the effective assistance of counsel in his state trial, and (2) his Sixth Amendment confrontation right was contravened when the state circuit court limited his cross-examination of a prosecution expert. The confrontation issue arose from the circuit court's application of West Virginia's rape shield law, and the circuit court's ruling precluded Barbe from examining the expert concerning J.M.'s sexual abuse by other men.[2]

Although the district court rejected Barbe's claims on these two issues, it granted him a certificate of appealability on each of them. As explained below, Barbe was not denied the effective assistance of counsel. His Sixth Amendment confrontation right was indisputably contravened, however, by the state circuit court's application of a per se rule restricting cross-examination of the prosecution's expert under

---

[1]Although J.M. has been referred to in some of the underlying proceedings and submissions by her full name, we prefer to protect her anonymity, as best we can, by using only her initials.

[2]We use the term "sexual abuse" — except when referring to the specific state charges of sexual abuse against Barbe — as a generic term encompassing various forms of sexual misconduct.

the state rape shield law — a ruling in conflict with what we term the "*Rock-Lucas* Principle" established by the Supreme Court of the United States. *See Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (recognizing that, rather than adopting per se rule for precluding evidence under rape shield statute, state courts must determine, on case-by-case basis, whether exclusionary rule "is 'arbitrary or disproportionate' to the State's legitimate interests" (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). Because the circuit court's Sixth Amendment error had a substantial and injurious effect on the jury's verdict as to the offenses involving J.M., we are constrained to deem him entitled to some habeas corpus relief. We therefore affirm in part, vacate in part, and remand for the issuance of a writ that is consistent herewith.

## I.

### A.

#### 1.

On September 19, 1999, a grand jury in Ohio County, West Virginia, returned a seventeen-count indictment against Barbe. The indictment included multiple charges relating to three victims: involving victim J.M., three counts of sexual assault, three counts of incest, and three counts of sexual abuse by a custodian (Counts One through Nine); involving victim B.H., two counts of sexual assault (Counts Ten and Eleven); and, involving victim S.S., six counts of sexual abuse (Counts Twelve through Seventeen). At trial in the state circuit court in December 1999, J.M., who was then eighteen years old, testified that Barbe, her maternal grandfather, had sexually abused her "about a hundred times or more" when she was between the ages of four and twelve and residing with Barbe and other family members. J.A. 961.[3] On cross-examination, J.M. admitted making a tape-recorded pretrial statement to her mother concerning the matter, in which she repudiated her earlier sexual abuse accusations against Barbe. She also admitted initiating a meeting with Barbe's defense counsel, during which she executed an affidavit swearing that Barbe had never sexually abused or inappropriately touched her. J.M. then

---

[3]Citations to "J.A. ___" refer to the Joint Appendix filed by the parties in this appeal.

asserted at trial that she was testifying truthfully to the jury about her sexual abuse by Barbe, and that she had said otherwise on tape and by affidavit in hopes of making the state criminal case "go away," because she did not want to have her "grandfather go to jail," her "family to hurt anymore," or for "them to blame [her] for what [Barbe] did to" her. *Id.* at 973.[4]

After J.M. testified, the prosecution called its expert, Ruth Ann Anderson, a licensed clinical counselor, for opinion evidence "in the area of counseling, specifically with regard to adults who have been sexually abused as children." J.A. 990. On direct examination, Anderson testified for the prosecution that she had met with J.M. eleven times over a five-month period and, in those meetings, J.M. had related "three separate incidents of [sexual] abuse" involving Barbe. *Id.* at 997-98. Based on symptoms J.M. exhibited at these meetings, Anderson opined that J.M. had in fact been sexually abused as a child because she fit the diagnostic criteria for post-traumatic stress disorder. In Anderson's view, J.M. "very strongly fit[ ] that criteria." *Id.* at 1002. The defense then sought to cross-examine Anderson about J.M's sexual abuse by men other than Barbe — abuse that might have caused her psychological profile. Before Anderson responded to the defense inquiry, the prosecution objected.

In the ensuing bench conference, the defense advised the state circuit court that it had been informed by Barbe that J.M. had previously accused two other men of sexually abusing her. The defense further advised the circuit court that there were witnesses available — in the hallway outside the courtroom — to testify, based on personal knowledge, about J.M.'s sexual abuse accusations against those men.[5] The

---

[4]J.M. later wrote an undated letter to West Virginia's Governor in which she referred to the trial as having occurred "about six years ago." J.A. 1390. In the letter, J.M. denied that Barbe had sexually abused her. She claimed, by way of explanation, that she had been molested by a male babysitter as a child and had utilized the details from that sexual abuse to make up stories about her grandfather.

[5]The defense also told the circuit court that the alleged sexual abuse of J.M. by other men occurred in Florida (perpetrated by J.M.'s father's roommate, who had since fled a related criminal charge) and in the local tri-state area (perpetrated by a restaurant employee or manager).

prosecution argued that the defense was precluded by West Virginia's rape shield law from questioning the prosecution's expert about J.M.'s alleged sexual abuse by other men. *See* W. Va. Code § 61-8B-11; W. Va. R. Evid. 404(a)(3).[6] The prosecution relied in this regard on the legal principle established by *State v. Quinn*, 490 S.E. at 40 (concluding that, absent showing of falsity, alleged victim's state-

---

Although the defense did not specify to the circuit court when the sexual abuse by other men was alleged to have occurred, it must have been clear to the court that it allegedly occurred prior to J.M.'s eighteenth birthday, which J.M. testified fell just four months before Barbe's trial. Indeed, Barbe has since asserted in these federal habeas corpus proceedings that J.M. was five years old at the time of the alleged abuse in Florida. The record further reflects that, on June 18, 1998, J.M. (then seventeen years old) filed an "Ohio Uniform Incident Report" alleging the offense of sexual imposition against the manager of the St. Clairsville, Ohio restaurant where she worked. J.A. 1536-39.

[6]The Supreme Court of Appeals of West Virginia has recognized that the rape shield law is comprised of both a statute, W. Va. Code § 61-8B-11, and an evidence rule, W. Va. R. Evid. 404(a)(3). *See State v. Quinn*, 490 S.E.2d 34, 38 (W. Va. 1997). In objecting to the defense's cross-examination of its expert, the prosecution specifically invoked the statutory component of the rape shield law, which provides, in relevant part, as follows:

> In any prosecution under this article [for a sexual offense] evidence of specific instances of the victim's sexual conduct with persons other than the defendant, opinion evidence of the victim's sexual conduct and reputation evidence of the victim's sexual conduct shall not be admissible: Provided, That such evidence shall be admissible solely for the purpose of impeaching credibility, if the victim first makes his or her previous sexual conduct an issue in the trial by introducing evidence with respect thereto.

W. Va. Code § 61-8B-11(b). The pertinent evidence rule makes an exception to the general bar against character evidence for, inter alia, evidence of "the victim's prior sexual conduct with persons other than the defendant, where the court determines at a hearing out of the presence of the jury that such evidence is specifically related to the act or acts for which the defendant is charged and is necessary to prevent manifest injustice." W. Va. R. Evid. 404(a)(3).

ments about sexual abuse by others constitutes inadmissable evidence under rape shield law). The prosecution asserted that the sole exception to the *Quinn* principle could be satisfied only if Barbe first demonstrated a strong probability that J.M.'s sexual abuse accusations against other men were false.

In response, the defense acknowledged that it could not rely on the falsity exception to the *Quinn* principle, as it wanted to demonstrate that J.M. had in fact been sexually abused by other men. The defense sought to show that such abuse — and not abuse by Barbe — was the predicate for J.M.'s psychological profile. Accordingly, instead of relying on the falsity exception to the *Quinn* principle, the defense essentially argued for an additional exception to that principle, asserting that *Quinn* "never anticipated us being gagged while [an expert] says that a victim exhibits all the classic signs of being sexually abused." J.A. 1014. The defense also contended that Barbe would not be accorded a fair trial if he was precluded from presenting evidence of J.M.'s sexual abuse accusations against other men, as an alternative explanation for her psychological profile.[7]

Unpersuaded by the defense's contentions, the state circuit court ruled that the defense's proposed line of inquiry into J.M.'s sexual abuse accusations was barred by the West Virginia rape shield law (the "Rape Shield Ruling"). The circuit court made the Rape Shield Ruling on the premise that the defense had neither sought to prove, nor proven, that such accusations were false — as was necessary to rely on the falsity exception to the *Quinn* principle. In such circum-

---

[7]The defense explained to the trial court why it should be permitted to cross-examine the prosecution's expert about J.M.'s sexual abuse accusations against other men as follows:

> [U]nfortunately, I don't think my client can get a fair trial unless the jury now hears that yes, of course, she exhibits these problems because they came or could have just as easily come from these other allegations she's made against people.

> * * *

> . . . . I'm attempting to get in these accusations occurred, and that's why she exhibits the psychological profile[.]

J.A. 1012-13.

stances, as the circuit court saw it, "the rape shield statute applies, period." J.A. 1014.[8] As a result of the Rape Shield Ruling, the defense had to proceed with its cross-examination of the prosecution's expert without inquiring into the possibility that J.M.'s psychological profile was predicated on sexual abuse perpetrated by men other than Barbe.[9]

2.

The jury ultimately convicted Barbe of six offenses involving J.M. (Counts Two, Three, Five, Six, Eight, and Nine), plus both offenses involving B.H. (Counts Ten and Eleven). Barbe was acquitted on the three remaining charges involving J.M, and all six charges involving S.S. On January 31, 2000, the state circuit court sentenced Barbe, who was then sixty-six years old, to imprisonment for not less than 80 nor more than 190 years.[10] On July 10, 2000, Barbe, through his trial counsel, filed a petition for a direct appeal to the Supreme Court of Appeals of West Virginia. In his petition, Barbe presented several contentions of error, including the contention that, by its Rape Shield

---

[8]Although the circuit court barred the defense from inquiring into J.M.'s sexual abuse accusations against other men, the court reassured the defense that "[y]ou made your record, and your record is solid. And, if you want to go up [to the state supreme court] and get another exception to the *Quinn* case, be my guest." J.A. 1014.

[9]The witnesses for the prosecution also included B.H. and S.S., the other two victims involved in the state charges against Barbe. B.H. testified that Barbe, who was her 4-H counselor, would sometimes drive her home from the 4-H activities. She said that, on several of these occasions, Barbe sexually abused her during the ride, but that she could specifically recall only two such incidents. S.S. testified that, when he was in third grade, he was sexually abused by Barbe (his then neighbor) on at least six occasions at Barbe's house. Additionally, four similar act witnesses testified, pursuant to West Virginia Rule of Evidence 404(b), about alleged sexual abuse by Barbe for which he had not been charged. Barbe did not take the stand on his own behalf.

[10]Specifically, Barbe was sentenced to consecutive sentences of 15 to 35 years on each of Counts Two and Three, 5 to 15 years on Counts Five and Six, 10 to 20 years on Counts Eight and Nine, and 10 to 25 years on Counts Ten and Eleven, for an aggregate of 80 to 190 years. Thus, 60 to 140 years of Barbe's aggregate sentence are for offenses committed against J.M., and 20 to 50 years are for offenses committed against B.H.

Ruling, the circuit court misapplied the state rape shield law to prohibit the defense from raising J.M.'s sexual abuse accusations against other men during cross-examination of the prosecution's expert. On February 6, 2001, the supreme court summarily denied Barbe's petition for appeal, with two of the five justices of the court voting to grant the petition. *See State v. Barbe*, No. 001865 (W. Va. Feb. 6, 2001).[11]

B.

Thereafter, Barbe filed a series of habeas corpus petitions and appeals in the state and federal courts. Throughout these proceedings, he has consistently and steadfastly asserted that the trial court's Rape Shield Ruling contravened his Sixth Amendment confrontation right. *See* U.S. Const. amend VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."). Although he explicitly invoked the *Rock-Lucas* Principle by name only in this appeal, he previously raised essentially the same proposition, relying on state authorities. As explained above, under the *Rock-Lucas* Principle, a state court cannot impose a per se rule for disallowing evidence under a rape shield law; rather, it must determine, on a case-by-case basis, whether the exclusionary rule "is 'arbitrary or disproportionate' to the State's legitimate interests." *Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

1.

On February 23, 2001, Barbe filed a pro se petition for habeas corpus relief in the state circuit court in which he had been tried, seeking the appointment of counsel and contending, inter alia, that his trial had been constitutionally impaired by the circuit court's erroneous Rape Shield Ruling. With respect to that Ruling, Barbe's petition asserted violations of his rights to a fair trial, the effective assistance

---

[11]In West Virginia, there is no intermediate court of appeals and there is no right of appeal from an adverse circuit court decision to the state supreme court. Instead, such appeals to the supreme court are wholly discretionary. *See* W. Va. Const. art. VIII, § 4; *Billotti v. Dodrill*, 394 S.E.2d 32, 35-38 (W. Va. 1990).

of counsel, and to be confronted with the witnesses against him, all under the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States, as well as similar provisions of the Constitution of West Virginia. On August 3, 2001, the circuit court, acting as the state habeas court, denied Barbe's pro se petition without either appointing counsel or conducting a hearing. *See Barbe v. Painter*, No. 01-C-77, slip op. at 3 (W. Va. Cir. Ct. Aug. 3, 2001). With respect to the Rape Shield Ruling, the circuit court concluded that, to the extent Barbe was "merely relitigating an evidentiary question that has been [previously] addressed," he was barred under the doctrine of res judicata from obtaining habeas corpus relief. *Id.* at 4. The circuit court further rejected the notion that its Rape Shield Ruling yielded any constitutional violations, specifically addressing what it termed claims of "[c]ourt-induced ineffective assistance of counsel," *id.* at 3, and of failure to permit questions on cross-examination resulting in "manifest abuse or injustice" under prior state decisions, *id.* at 7 (internal quotation marks omitted). The circuit court did not explicitly address Barbe's assertion that his confrontation right — under both the Sixth Amendment and its state constitutional counterpart — had also been contravened.

In October 2001, Barbe filed a petition for appeal in the state supreme court concerning the circuit court's denial of his pro se habeas corpus petition. Thereafter, on January 24, 2002, the supreme court granted limited relief, directing that Barbe be awarded a hearing on his habeas corpus petition, and that counsel be appointed to represent him. *See Barbe v. Coleman*, No. 012171 (W. Va. Jan. 24, 2002).

In an amended petition for state habeas corpus relief filed in the state circuit court by Barbe's new lawyer on September 24, 2002, Barbe outlined ten different ways in which his trial counsel was constitutionally ineffective, including, but not limited to, counsel's performance with respect to the Rape Shield Ruling. Barbe also asserted, inter alia, that the circuit court had erred in making that Ruling at trial. In a memorandum of law supporting his amended habeas corpus petition, filed February 3, 2003, Barbe specified that his Sixth Amendment confrontation right was contravened by the Rape Shield Ruling. Barbe contended that the circuit court should have balanced his Sixth Amendment confrontation right against J.M.'s right to privacy and, upon doing so, allowed him to cross-examine the prosecu-

tion's expert about J.M.'s sexual abuse accusations against other men. Among other authorities, Barbe relied on *State v. Green*, 260 S.E.2d 257, 261 (W. Va. 1979), in which the state supreme court recognized that "[m]ost rape shield statutes that have been judicially examined" — though not that of West Virginia — "provide for balancing Sixth Amendment claims against a victim's privacy rights." Barbe observed that the state legislature had not heeded the *Green* court's advice to amend section 61-8B-11 to explicitly provide for such a balancing during in camera proceedings, *see Green*, 260 S.E.2d at 264, but that West Virginia Rule of Evidence 404(a)(3) was later adopted to allow for certain evidence of a sexual offense victim's prior sexual conduct "where the court determines at a hearing out of the presence of the jury that such evidence is specifically related to the act or acts for which the defendant is charged and is necessary to prevent manifest injustice." *See supra* note 6 (explaining that West Virginia rape shield law in current form is comprised of both statute, W. Va. Code § 61-8B-11, and evidence rule, W. Va. R. Evid. 404(a)(3)).[12] Barbe further observed that the state supreme court had since invoked Rule 404(a)(3) in *State v. Quinn* (the very case relied on by the circuit court for its Rape Shield Ruling) to provide an example of when a *true* sexual abuse allegation against someone other than the defendant may be admissible under the rape shield law: "[I]f the causation of the alleged enlargement of [the victim's] vaginal area had been an issue at trial, the [defendant's] proposed use of evidence of [the victim's] sexual conduct might not have been prohibited by our rape shield law — if the evidence were offered to rebut the inference that the [defendant's] conduct had caused the alleged enlargement." *Quinn*, 490 S.E.2d at 42 n.14. According to Barbe, the *Quinn* court's example is analogous to his case, and the Rape Shield Ruling was thus manifestly unjust under Rule 404(a)(3), and violative of his Sixth Amendment confrontation right.[13]

---

[12]The West Virginia Rules of Evidence, including Rule 404(a)(3), became effective on February 1, 1985.

[13]Barbe's assertion that the circuit court should have balanced his Sixth Amendment confrontation right against J.M.'s right to privacy is essentially the same as raising the *Rock-Lucas* Principle. The Principle requires a state court to determine, on a case-by-case basis, whether an exclusionary rule "is 'arbitrary or disproportionate' to the State's legitimate interests." *Lucas*, 500 U.S. at 151 (quoting *Rock*, 483 U.S. at 56). And, one such legitimate interest is in protecting sexual abuse victims from "unnecessary invasions of privacy". *Lucas*, 500 U.S. at 150.

At the time Barbe filed his February 3, 2003 memorandum of law in support of his amended habeas corpus petition, the state circuit court had already conducted, on December 6, 2002, the supreme court-mandated hearing. Thereafter, in a two-page opinion dated April 8, 2003, the circuit court summarily denied Barbe's request for habeas corpus relief and dismissed his amended petition, stating that "the Petition is without merit, and further is not deserving of a hearing." *Barbe v. Painter*, No. 01-C-77, slip op. at 1 (W. Va. Cir. Ct. Apr. 8, 2003).[14]

As a result, Barbe filed his third petition for appeal in the state supreme court, again asserting, inter alia, that his trial counsel was constitutionally ineffective and his Sixth Amendment confrontation right was contravened by the Rape Shield Ruling. On February 11, 2004, the supreme court denied this petition for appeal, declining to accord appellate review to the issues sought to be presented. *See Barbe v. Painter*, No. 031859 (W. Va. Feb. 11, 2004).[15]

2.

On May 6, 2004, Barbe filed his federal habeas corpus petition, pursuant to 28 U.S.C. § 2254, in the Northern District of West Virginia. In the district court, Barbe (once again proceeding pro se) pre-

---

[14]At oral argument before this Court, the State conceded that the circuit court had erred in ruling in its April 8, 2003 opinion that Barbe's amended habeas corpus petition was "not deserving of a hearing." In fact, the state supreme court had mandated such a hearing by its order of January 24, 2002, and, as noted, the circuit court had conducted a hearing on December 6, 2002. Indeed, at this hearing, Barbe's testimony was taken and the circuit court established a briefing schedule. The parties subsequently filed their briefs but, on April 8, 2003, the circuit court proceeded as if none of this had ever occurred.

[15]Two of the five justices of the supreme court voted to grant Barbe's final petition for appeal from the denial of state habeas corpus relief, on the premise that cases involving sentences of life imprisonment, or sentences that are effectively life sentences due to age (as in this case), should be accorded appellate review. *See Barbe v. Painter*, No. 031859 (W. Va. Feb. 11, 2004). Those same two justices had previously voted to grant Barbe's first petition for appeal following his jury convictions. *See State v. Barbe*, No. 001865 (W. Va. Feb. 6, 2001).

sented six grounds for relief, including that: (1) he was denied his Sixth Amendment right to the effective assistance of counsel in his state trial (the "Ineffective Assistance Issue"); and (2) his Sixth Amendment confrontation right was contravened by the state circuit court's Rape Shield Ruling (the "Confrontation Issue"). With respect to the Confrontation Issue, Barbe relied on many of the same authorities relied on in support of his amended state habeas petition — including West Virginia Rule of Evidence 404(a)(3) and the state supreme court's decisions in *State v. Green* and *State v. Quinn* — for the proposition that a trial court must balance the defendant's Sixth Amendment confrontation right against the victim's right to privacy in assessing rape shield law issues. The federal magistrate judge reviewed and assessed Barbe's claims and, on July 25, 2005, filed a comprehensive report denying a hearing and recommending that Barbe's § 2254 petition be denied and dismissed with prejudice. *See Barbe v. McBride*, No. 5:04-cv-00053-IMK (N.D. W. Va. July 25, 2005).

Barbe then filed objections to the magistrate judge's report, and, on September 28, 2005, the district court filed the order from which this appeal arises, adopting the recommendations of the report and dismissing Barbe's § 2254 petition with prejudice. *See Barbe v. McBride*, No. 5:04-cv-00053-IMK (N.D. W. Va. Sept. 28, 2005). Thereafter, on October 14, 2005, Barbe filed a pro se application with the district court for a certificate of appealability ("COA"), pursuant to 28 U.S.C. § 2253(c). On August 29, 2006, the court granted Barbe a COA on both of the claims presented here — the Ineffective Assistance Issue and the Confrontation Issue. In awarding the COA, the court explained that, even though it had denied relief on these two issues, they could nonetheless be deemed debatable by reasonable jurists. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) ("Where a district court has rejected [a petitioner's] constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.").

This Court received notification of the COA and Barbe's appeal on September 1, 2006, and we appointed counsel to represent him on February 15, 2007. In his formal opening brief, Barbe specifically

invoked the Supreme Court decisions in *Rock* and *Lucas* with respect to the Confrontation Issue, contending, inter alia, that "[u]nder clear United States Supreme Court case law, per se exclusions under state rape shield statutes are impermissible. State courts must make a case-by-case determination of whether statutory restrictions are arbitrary or disproportionate to the purpose they are designed to serve." Br. of Appellant 11. We possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

## II.

We review de novo a district court's denial of federal habeas corpus relief on the basis of a state court record. *See Tucker v. Ozmint*, 350 F.3d 433, 438 (4th Cir. 2003). Having now conducted such review, we affirm the district court with respect to its denial of relief on the Ineffective Assistance Issue.[16] We deem the Confrontation Issue, however, to be a more troubling and serious constitutional problem, and we thus dedicate the remainder of our decision to it. Based on the following assessment, we vacate the district court's dis-

---

[16]On the Ineffective Assistance Issue, Barbe confined his claims to three aspects of his trial counsel's performance (which were among the ten aspects raised in the state habeas corpus proceedings): failure to procure an expert witness, failure to object to the testimony of the similar act witnesses, and failure to adequately prepare for trial. The district court — applying the principles of *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (recognizing that ineffective assistance claim requires showing (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense") — concluded that Barbe's claims failed on *Strickland*'s first prong because the challenged aspects of his counsel's performance must be considered, under the appropriate highly deferential standard, to be sound trial strategy. We agree with the court's assessment of the Ineffective Assistance Issue. *See United States v. Roane*, 378 F.3d 382, 404-05 (4th Cir. 2004) ("Under the first prong of *Strickland*, we apply a 'strong presumption' that a trial counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" (quoting *Strickland*, 466 U.S. at 689)). In any event, Barbe has not satisfied *Strickland*'s second prong by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

position of the Confrontation Issue in part, and remand for the issuance of a writ of habeas corpus that is consistent herewith.

A.

We begin our assessment of the Confrontation Issue by identifying the appropriate parameters of such review. Importantly, in considering federal habeas corpus issues involving state evidentiary rulings, "we do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000). "It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." *Spencer v. Murray*, 5 F.3d 758, 762 (4th Cir. 1993) (internal quotation marks omitted); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (explaining that, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). In light of these limitations on the scope of our inquiry, we confine our consideration of the Confrontation Issue to the question of whether the Rape Shield Ruling contravened Barbe's Sixth Amendment confrontation right, without examining such issues as whether the state circuit court properly interpreted the West Virginia rape shield law itself.

Moreover, we observe that — although the state circuit court (as the final state court to fully consider Barbe's habeas corpus claims) failed to provide an explicit explanation for its denial of relief on the Confrontation Issue in its opinions of August 3, 2001, and April 8, 2003 (collectively, the "State Court Decision") — it did adjudicate the Confrontation Issue on the merits. *See Weeks v. Angelone*, 176 F.3d 249, 259 (4th Cir. 1999) (recognizing that state habeas court may adjudicate claim on merits but "give[ ] no indication of how it reached its decision"). Accordingly, the State Court Decision is entitled to deference pursuant to the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2254(d); *see also Fisher v. Lee*, 215 F.3d 438, 445 (4th Cir. 2000) (observing that "[i]f the claim was properly presented to the state court and the state court adjudicated it, the deferential standard of review set forth in § 2254(d) applies").

AEDPA instructs us to utilize a two-step analysis to assess whether Barbe is entitled to federal habeas corpus relief on the Confrontation Issue. Under the first step of the AEDPA analysis, we may award relief only if (a) the state court adjudication of the issue on its merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (b) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). And, even if error is identified, habeas corpus relief can only be granted, under the second step of the AEDPA analysis, if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahmson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002). We now turn to and conduct our two-step AEDPA analysis of the Confrontation Issue.

B.

Under the first step of the AEDPA analysis, we may award federal habeas corpus relief to Barbe only if, inter alia, the state circuit court's adjudication of the Confrontation Issue on its merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). As the Supreme Court has explained, a state court decision is contrary to clearly established federal law if the "court arrives at a conclusion opposite that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision involves an unreasonable application of federal law if the court "correctly identifies the governing legal rule but applies it unreasonably to the facts of [the particular] case," or if the court "is unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Conaway v. Polk*, 453 F.3d 567, 581 (4th Cir. 2006) (internal quotation marks omitted). "Stated simply, a federal habeas court making the 'unreasonable application' inquiry

should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409.

For the reasons that follow, we conclude that the State Court Decision involves an objectively unreasonable application of federal law, in that the state circuit court either "correctly identifie[d] the governing legal rule" — i.e., the *Rock-Lucas* Principle — "but applie[d] it unreasonably to the facts," or was "unreasonable in refusing to extend the governing legal principle to a context in which it should have controlled." *Conaway*, 453 F.3d at 581 (internal quotation marks omitted). Because of the sparse and cryptic nature of the circuit court's explanation for its denial of habeas corpus relief, we are uncertain if the circuit court failed to assess whether the rape shield law was arbitrary or disproportionate to the State's legitimate interests in the circumstances of Barbe's case, or if it made the relevant assessment and decided against Barbe. Indeed, the court failed to identify or discuss a single state or federal legal authority (including *Rock* or *Lucas*) with particular respect to Barbe's contention that the Rape Shield Ruling contravened his Sixth Amendment confrontation right. In any event, either of these alternative bases for the State Court Decision amounts to an objectively unreasonable application of federal law.

1.

By its Rape Shield Ruling at Barbe's trial, the state circuit court prohibited the defense from cross-examining the prosecution's expert about J.M.'s sexual abuse accusations against men other than Barbe. The defense had sought to demonstrate that J.M.'s sexual abuse by other men was the predicate for her psychological profile as a victim of child sexual abuse. The defense contended that, if it was prohibited from questioning the expert about J.M.'s sexual abuse accusations against others, Barbe would not be accorded a fair trial. The circuit court sustained the prosecution's objection to the defense's proposed line of inquiry, however, on the ground that it was barred by the West Virginia rape shield law. More particularly, the circuit court, in making the Rape Shield Ruling, purported to rely solely on *State v. Quinn*. *See* 490 S.E.2d 34, 40 (W. Va. 1997) (concluding that, absent showing of falsity, alleged victim's statements about sexual abuse by others constitutes inadmissible evidence under rape shield law). Because Barbe was not relying on the falsity exception to the *Quinn* principle,

the circuit court concluded, applying a per se exclusionary rule, that "the rape shield statute applies, period." J.A. 1014.[17]

As background on *Quinn*, the defendant therein — while on trial for sexual misconduct toward a child (T.M.) by a custodian — had been prohibited from cross-examining T.M. about her statements that she had been sexually abused by persons other than Quinn. *See* 490

---

[17]In the State's appellate brief, it contends that Barbe's trial counsel did not possess a good faith basis for inquiring about other incidents of sexual abuse. Significantly, this case began in Ohio County in December 1999. Since then, it has been before numerous courts and judges: It has been considered by the state circuit court three times, by the state supreme court three times, and by the federal magistrate judge and district judge. Through all of these proceedings, the State never saw fit to raise any issue with respect to lack of good faith. This point is being asserted for the first time in this appeal, and, as a general proposition, "issues that were not raised in the district court will not be addressed on appeal." *Incumaa v. Ozmint*, 507 F.3d 281, 289 n.6 (4th Cir. 2007). We see no need to diverge from the general practice here.

In any event, if we were to consider the merits of the good faith contention, our outcome would be the same. Barbe's defense counsel plainly had a good faith basis for asking the prosecution's expert if she was aware of J.M.'s sexual abuse accusations against others, because Barbe had related to his lawyer details of sexual abuse incidents that had allegedly occurred in Florida and the local tri-state area. Counsel also advised the trial court that witnesses were available, in the hallway outside the courtroom, to testify about J.M.'s sexual abuse accusations. This proffer is more than sufficient to establish a good faith basis to pursue the defense's proposed line of inquiry. *See* Michael H. Graham, *Handbook of Federal Evidence* § 607:2 (6th ed. 2006) (explaining that to have good faith basis, "[t]he examiner must have a reasonable factual foundation, such as the credible report of another witness or *one's client*" (emphasis added)); *see also* Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6-8(B)(2)(c) (4th ed. 2000) ("The good faith basis does not have to be admissible evidence, but it must be something that persuades the trial judge the question is proper, such as an affidavit, a reliable record, or *a potential live witness*." (emphasis added)). Finally, the trial court did not have an opportunity to make a determination on this issue because it decided that the rape shield law applied, and ended the discussion there, failing to accord Barbe the opportunity to further establish that he was proceeding in good faith.

S.E.2d at 37-38.[18] Quinn sought to demonstrate that T.M.'s sexual abuse allegations against others were false and, thus, constituted evidence that T.M. was also lying about him. *See id.* at 38. Quinn reasoned that, because "T.M.'s statements were *false*," they "were not evidence of T.M.'s sexual conduct" within the protection of the state rape shield law. *Id.*; *see also supra* note 6 (quoting relevant provisions of rape shield law and explaining that, in current form, law is comprised of both statute, W. Va. Code § 61-8B-11, and evidence rule, W. Va. R. Evid. 404(a)(3)). As the state supreme court observed, however, the "rape shield law applied to T.M.'s statements to the extent that the statements were true." *Id.* at 39. The supreme court then held that, to avoid the exclusion of such statements under the rape shield law, the defendant must "establish[ ] to the satisfaction of the trial judge outside of the presence of the jury that there is a strong probability that the alleged victim's other statements are false." *Id.* at 40. And, the supreme court concluded that Quinn's "proffer to the trial court fell far short of showing a strong probability that T.M.'s statements were false." *Id.* at 41.

Here, the state circuit court, in making its Rape Shield Ruling, apparently interpreted *Quinn* to stand for the proposition that all *true* sexual abuse allegations made by a victim against someone other than the defendant are inadmissible under the rape shield law — i.e., that "the rape shield statute applies, period." J.A. 1014. As relevant to the limited Confrontation Issue before us, Barbe contended in his pro se state habeas corpus petition that the Rape Shield Ruling contravened his Sixth Amendment confrontation right. And, he expounded on this contention in the memorandum of law supporting his amended state petition, asserting therein (with citation to state authorities) that the circuit court should have balanced his Sixth Amendment confrontation right against J.M's right to privacy. Nevertheless, the state circuit court denied Barbe habeas corpus relief on the Confrontation Issue without explicitly addressing its merits in either of the two opinions comprising the State Court Decision to which we give deference today — the August 3, 2001 opinion denying Barbe's pro se state habeas corpus petition, and the April 8, 2003 opinion dismissing his amended state petition. Indeed, the court failed to identify or discuss

---

[18]We reviewed the state supreme court's *Quinn* in our decision in *Quinn v. Haynes*, 234 F.3d 837 (4th Cir. 2000). *See infra* Part II.B.2.

a single state or federal legal authority (including *Rock* or *Lucas*) with particular respect to Barbe's contention that the Rape Shield Ruling contravened his Sixth Amendment confrontation right.[19]

2.

Upon investigation, the state circuit court — in its role as the trial court and the state habeas court — should have readily discovered the *Rock-Lucas* Principle (as developed and discussed in *Rock* and *Lucas*, as well as a myriad of other federal and state cases advancing the same legal principle). Indeed, the *Rock-Lucas* Principle was extensively discussed in *Quinn v. Haynes*, 234 F.3d 837 (4th Cir. 2000), where we assessed on federal habeas corpus review the Sixth Amendment claim in *State v. Quinn*, 490 S.E.2d 34 (W. Va. 1997) — the very decision underlying the Rape Shield Ruling. Our *Quinn* decision issued after Barbe's December 1999 trial, but before he filed his initial state habeas corpus petition in February 2001.

In *Rock*, decided in 1987, the Supreme Court assessed whether a

---

[19]Notably, although we rely on the *Rock-Lucas* Principle herein, it was not necessary for Barbe to specifically name the *Rock* and *Lucas* decisions in the state habeas corpus proceedings in order to exhaust his confrontation claim, or for the state circuit court to consider those decisions (or any other applicable federal precedent) in order to refrain from an unreasonable application of federal law. That is, Barbe's confrontation claim was "fairly presented" to the circuit court — and, thus, exhausted — in that "[t]he ground relied upon [was] presented face-up and squarely," "the federal question [was] plainly defined," and "both the operative facts and the controlling legal principles" were identified. *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997) (internal quotation marks omitted); *see also supra* note 13 (observing that "Barbe's assertion that the circuit court should have balanced his Sixth Amendment confrontation right against J.M.'s right to privacy is essentially the same as raising the *Rock-Lucas* Principle"). And, in assessing the confrontation claim, the circuit court was entitled to look to, for example, the state authorities cited by Barbe. *Cf. Early v. Packer*, 537 U.S. 3, 8 (2002) (concluding that, to avoid pitfall of rendering decision "contrary to" federal law, state court need not cite or even be aware of relevant Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them").

per se evidentiary rule excluding testimony refreshed by hypnosis contravened the petitioner's right to testify on her own behalf as a defendant in a criminal case. *See Rock v. Arkansas*, 483 U.S. 44, 45 (1987). The Court observed that "when a state rule of evidence conflicts with the right to present witnesses, the rule may not be applied mechanistically to defeat the ends of justice, but must meet the fundamental standards of due process." *Id.* at 55 (internal quotation marks omitted). Accordingly, the Court concluded that, "[i]n applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." *Id.* at 56. Importantly, the restrictions imposed "may not be arbitrary or disproportionate to the purposes they are designed to serve." *Id.*

Four years later, in 1991, the Supreme Court specifically extended its holding in *Rock* to rape shield issues, by way of its decision in *Michigan v. Lucas*, 500 U.S. 145 (1991). In *Lucas*, the Court vacated a Michigan ruling that a notice-and-hearing requirement in the state's rape shield statute was *always* unconstitutional when used to bar the admission of evidence concerning earlier sexual conduct involving a rape victim and the accused. *Id.* at 148. In so doing, the Court recognized that the rape shield statute "unquestionably implicates the Sixth Amendment," in that, "[t]o the extent that it operates to prevent a criminal defendant from presenting relevant evidence, the defendant's ability to confront adverse witnesses and present a defense is diminished." *Id.* at 149. The Court further observed, however, that "[t]his does not necessarily render the statute unconstitutional," because Sixth Amendment rights "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.* (internal quotation marks omitted). Invoking *Rock*, the Court continued that "[r]estrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *Id.* at 151 (quoting *Rock*, 483 U.S. at 56). Thus, the Court rejected the use of any per se evidence rule favoring either the prosecution or the defense, and specified that a state court must determine, on a case-by-case basis, whether application of the rule "is 'arbitrary or disproportionate' to the State's legitimate interests." *Id.* (quoting *Rock*, 483 U.S. at 56).

In our subsequent 2000 decision in *Quinn v. Haynes*, we assessed, on federal habeas corpus review, whether the West Virginia supreme court's exclusion, in *State v. Quinn*, of evidence proffered to impeach victim T.M. contravened Quinn's Sixth Amendment confrontation right. In making our assessment, we recognized and carefully explained that the *Rock-Lucas* Principle constitutes clearly established federal law. *See* 234 F.3d at 848-49 ("[T]he Supreme Court has established an analytical framework that courts should use when evaluating Confrontation Clause challenges based upon the exclusion of evidence[, requiring them to] determine whether the rule relied upon for the exclusion of evidence is 'arbitrary or disproportionate' to the 'State's legitimate interests.'" (citing *Lucas*, 500 U.S. at 151; *Rock*, 483 U.S. at 55)). We further recognized that

> [i]f the state supreme court's holding [in *State v. Quinn*] under West Virginia's rape shield law[ ] is arbitrary or disproportionate to the interests the rape shield law was designed to serve, the state supreme court applied federal law in an objectively unreasonable way when it limited Quinn's presentation of impeachment evidence regarding T.M.'s other allegations of sexual assault.

*Id.* at 849-50. We then concluded that the state supreme court's exclusion of Quinn's proffered impeachment evidence was "neither arbitrary nor disproportionate to the State's legitimate interests underlying its implementation of its rape shield law," and, thus, that "the state supreme court did not unreasonably apply federal law when it applied the State's rape shield law to limit Quinn's proffered impeachment evidence." *Id.* at 851. In short, we assessed the rape shield ruling at issue under the *Rock-Lucas* Principle, and concluded that, in the circumstances presented, the ruling was neither arbitrary nor disproportionate to the State's interests.

One of our sister circuits recently had occasion to evaluate and apply such an approach to a rape shield issue in a federal habeas corpus case. In *White v. Coplan*, the First Circuit, applying AEDPA principles, reviewed a trial court's decision to bar White, who was accused of sexual assault, from offering evidence that his alleged victim had previously made similar accusations against other persons — notwithstanding evidence of a reasonable probability of the falsity of

the other claims — premised on a rape shield law similar to West Virginia's. *See* 399 F.3d 18, 24 (1st Cir. 2005). Relying on *Rock* and *Lucas*, the First Circuit concluded that these decisions, "clear although general, call[ ] for a balancing of interests depending on the circumstances of the case." *Id.* The court of appeals also explained that, even if a state rule of exclusion is generally defensible, it can be applied in an unconstitutional manner to a particular set of facts. *Id.* Finally, it recognized that White's Sixth Amendment confrontation right had been contravened at trial, because the state court's failure to admit the excluded evidence was an "unreasonable application" of the controlling *Rock-Lucas* Principle. *Id.* at 25.

We now reiterate that the *Rock-Lucas* Principle constitutes clearly established federal law determined by the Supreme Court of the United States. The *Rock-Lucas* Principle clearly mandates that a state court, in ruling on the admissibility of evidence under a rape shield law, must eschew the application of any per se rule in favor of a case-by-case assessment of whether the relevant exclusionary rule "is 'arbitrary or disproportionate' to the State's legitimate interests." *Lucas*, 500 U.S. at 151 (quoting *Rock*, 483 U.S. at 56).

3.

In making the Rape Shield Ruling at trial, the state circuit court contravened the *Rock-Lucas* Principle. That is, the circuit court applied a per se exclusionary rule, premised on its conclusion that, because Barbe was not relying on the falsity exception to the rape shield law recognized in *State v. Quinn*, "the rape shield statute applies, period." J.A. 1014. As the Supreme Court explained in *Lucas*, a court's adoption and application of a per se exclusionary rule — absent consideration of the specific facts of the case, and absent an appropriate assessment of the legitimate competing interests of the accused and the State — constitutes error. *See Lucas*, 500 U.S. at 153. In the state habeas proceedings, Barbe adequately presented this contention to the state circuit court. Although the issue was then squarely before the circuit court, it failed to conduct the appropriate assessment or, alternatively, failed to explain how it had made the assessment and nonetheless ruled that applying the rape shield law in Barbe's case was neither arbitrary nor disproportionate to the State's legitimate

interests. In either event, the State Court Decision involves an objectively unreasonable application of clearly established federal law.

We premise our conclusion on several relevant factors that a court should consider in conducting the *Rock-Lucas* assessment: (1) the strength *vel non* of the state's interests that weigh against admission of the excluded evidence, *see Chambers v. Mississippi*, 410 U.S. 284, 295 (1973); (2) the importance of the excluded evidence to the presentation of an effective defense, *see Davis v. Alaska*, 415 U.S. 308, 319 (1974); and (3) the scope of the evidence ban being applied against the accused, *see Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986). These factors, derived from controlling Supreme Court precedent, were aggregated for purposes of the *Rock-Lucas* Principle in the First Circuit's *White* decision. *See White*, 399 F.3d at 24.[20] We examine these factors in conducting our *Rock-Lucas* assessment of Barbe's Confrontation Issue.

a.

First, with respect to the strength *vel non* of the state interests that weigh against admission of the evidence Barbe sought to utilize, the State indisputably possessed a legitimate interest in having its rape shield law enforced. *See White*, 399 F.3d at 24 (citing *Chambers*, 410 U.S. at 295). As Judge Williams explained in our *Quinn* decision, "[t]he Supreme Court has recognized that a state has a valid interest in protecting victims of sexual abuse from needless harassment, humiliation, and 'unnecessary invasions of privacy.'" *Quinn v. Haynes*, 234 F.3d at 850 (quoting *Lucas*, 500 U.S. at 150).[21] Addition-

---

[20]The Supreme Court's decisions in *Chambers*, *Davis*, and *Van Arsdall* were rendered prior to *Rock* and *Lucas*, and address the Sixth Amendment's confrontation right.

[21]Notably, a state's interest in protecting sexual abuse victims from harassment, humiliation, and invasions of privacy is especially compelling when the testifying victim is a child, in that questioning about sexual conduct is potentially "more psychologically damaging" to children. *Quinn*, 234 F.3d at 850. In this situation, of course, J.M. was eighteen years old when she testified at Barbe's trial. Consequently, any risk of psychological damage to J.M. from having prior sexual abuse incidents discussed in court was mitigated by the fact that she was then an adult. In any event, J.M. was not the witness being asked about such incidents; rather, the inquiry was being made to the prosecution's expert.

ally, a state rape shield law properly serves to encourage the victims of sexual misconduct to institute and participate in legal proceedings against sexual offenders. *See* Fed. R. Evid. 412 advisory committee's note.

b.

Second, we must evaluate the importance of the banned evidence to Barbe's presentation of an effective defense. *See Davis*, 415 U.S. at 319. The Supreme Court has consistently characterized Sixth Amendment guarantees in strong terms: "The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *see also Davis*, 415 U.S. at 315 ("The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him." (internal quotation marks omitted)).

In this matter, Barbe's effort to cross-examine the prosecution's expert concerning J.M.'s sexual abuse by others was crucial to his presentation of an effective defense. When the expert testified, the defense had already impeached J.M.'s testimony with her previous conflicting versions of her own story, showing that she was a confessed liar. As noted earlier, J.M. initially accused Barbe of sexually assaulting her, then made a tape recording and executed an affidavit swearing that he had never sexually abused her. J.M. thereafter asserted at trial that both her tape recording and affidavit were false and that Barbe had, in fact, sexually abused her. To bolster J.M.'s credibility, the prosecution presented its expert, who opined that J.M. exhibited the psychological profile of an adult who had been sexually abused as a child, and also testified that J.M. had related to her at least three incidents of sexual abuse involving Barbe. That testimony, if left uncontradicted and unimpeached, corroborated the trial testimony of J.M. and created the sole logical inference that her psychological profile resulted from abuse by Barbe.

Thus, Barbe's trial defense on the J.M. offenses — an entirely logical and permissible one — was to show that J.M. was not a credible witness, and that her sexual abuse by other men had caused her psychological profile. When the state circuit court barred Barbe from

questioning the prosecution's expert concerning J.M.'s abuse by others, its Rape Shield Ruling undercut and effectively scuttled his defense on the J.M. offenses. The jury was thus left with only one permissible inference — that J.M.'s psychological profile resulted from her abuse by Barbe, and that Barbe, consequently, was guilty of having abused J.M.

c.

Finally, under Supreme Court precedent, *see Van Arsdall*, 475 U.S. at 678-79, we must consider the scope of the evidentiary ban invoked against Barbe. After the direct testimony of the prosecution's expert, Barbe was barred by the Rape Shield Ruling from any cross-examination concerning J.M.'s sexual abuse by other men. As explained above, the cross-examination of the expert concerning J.M.'s sexual abuse by others was essential to Barbe's presentation of an effective defense, in that it was his only means to demonstrate an alternative explanation for J.M.'s psychological profile and, thus, the only way to rebut the inference created by the expert's testimony. Accordingly, although the Rape Shield Ruling only limited Barbe's cross-examination of the expert, its scope prevented Barbe from presenting his defense on the J.M. offenses.

Having conducted the *Rock-Lucas* assessment, we are thus constrained to conclude that application of the West Virginia rape shield law at Barbe's trial was disproportionate to the State's interests in having the law applied. Barbe's defense was critically impaired by the Rape Shield Ruling and, in these circumstances, the Ruling indisputably contravened his Sixth Amendment confrontation right. The state circuit court, as the state habeas court, thus unreasonably applied federal law by failing to extend the *Rock-Lucas* Principle to Barbe's Sixth Amendment confrontation claim, or, alternatively, by applying that Principle but ruling against Barbe.[22]

---

[22]Several of our sister courts of appeals have also concluded that a defendant's interests in introducing evidence that conflicts with a state rape shield law outweighs the State's interests in having the law applied. *See Tague v. Richards*, 3 F.3d 1133 (7th Cir. 1993) (concluding defendant's confrontation right was violated when court barred evidence that

## C.

In light of the foregoing, we are obliged to turn to the second step of the AEDPA analysis — an assessment of whether the state circuit court's Sixth Amendment error in the Rape Shield Ruling had a substantial and injurious effect on the verdict. Under AEDPA, we are not entitled to award relief to a habeas corpus petitioner unless the error of which he complains resulted in, as the Supreme Court has explained, a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. If we are in "grave doubt" concerning the effect of such a constitutional error, the habeas petitioner is entitled to prevail. *Fullwood*, 290 F.3d at 679. Such a "grave doubt" exists when, in the relevant circumstances, the question is so evenly balanced that the reviewing court finds itself in "virtual equipoise" on the harmlessness issue. *Id.* Barbe contends that the Sixth Amendment error in this case had a substantial and injurious effect on the jury's verdict with respect to all of his convictions. We will, in that regard, first address the offenses involving J.M., and then turn to those involving B.H.

### 1.

As related above, Barbe was indicted for sexually abusing three victims: J.M., B.H., and S.S.[23] He was convicted on two offenses involving B.H. and six involving J.M., but was acquitted on all six

---

provided alternative explanation for physical evidence of sexual assault of victim); *United States v. Bear Stops*, 997 F.2d 451 (8th Cir. 1993) (relying on *Rock* and concluding that restriction on confrontation right was disproportionate to purpose that rape shield statute was designed to serve when the defendant was barred from introducing evidence of alternative explanation for victim's psychological profile); *United States v. Begay*, 937 F.2d 515 (10th Cir. 1991) (applying Federal Rules of Evidence 403 and 412 and concluding that trial court's exclusion of evidence offering alternative explanation of sexual assault victim's physical symptoms contravened confrontation right).

[23]In addition to J.M., B.H., and S.S., four other witnesses testified that Barbe had sexually abused them in the past. No charges were instituted against Barbe relating to the evidence of the four other witnesses.

charges involving S.S. and three of those involving J.M. Thus, although the evidence may have established a pattern of abusive behavior by Barbe, a reasonable doubt was nevertheless recognized by his trial jury with respect to nine of the offenses alleged in the indictment. As the record reflects, J.M. was the key witness against Barbe on nine of the seventeen charges. And, importantly, she gave contradictory and conflicting versions of her story on multiple occasions. First, these proceedings began when J.M. accused Barbe of sexual abuse. Then, prior to trial, J.M. made a tape-recorded statement, and executed an affidavit, attesting that Barbe had never sexually abused her at all. She thereafter changed her testimony again, asserting to the jury at trial that Barbe had in fact sexually abused her when she was a child.[24]

In order to deal with the multiple versions of J.M.'s story, the prosecution utilized its expert evidence to corroborate J.M.'s trial testimony and thus buttress the allegation that Barbe had indeed sexually abused her. Barbe's defense was thereafter circumscribed and effectively scuttled by his inability to present the jury with — and thus argue — an alternative explanation for J.M.'s psychological profile. Accordingly, the jury was left with only one permissible inference — that J.M.'s psychological profile resulted from her having been abused by Barbe. In these circumstances, with J.M.'s contradictory accounts of such abuse, and the state circuit court having barred Barbe, by its Rape Shield Ruling, from presenting his defense on the J.M. offenses, we are left with "grave doubt" concerning the injurious effect of the Sixth Amendment error that occurred. In such circumstances, we must conclude that the Rape Shield Ruling had a substantial and injurious effect on the jury's verdict.

2.

Finally, Barbe maintains that the Sixth Amendment error permeated his entire trial, including his convictions on two sexual abuse offenses against B.H. On this point, he maintains that the expert's testimony supported the prosecution's overall theory that Barbe was simply an evil old man who took improper liberties with children.

---

[24]Finally, J.M. changed her story at least one more time, in a post-trial letter written to the Governor. *See supra* note 4.

Although this assertion might be somewhat plausible, our primary basis for grave doubt concerning the injurious effect of the constitutional error that occurred is simply this: J.M. presented so many conflicting and contradictory versions of the relevant events that the expert testimony was essential to Barbe's convictions on the six offenses involving her. Those circumstances are not, however, applicable to Barbe's other two convictions, which relate to offenses involving B.H. In fact, it is abundantly clear that the jury was capable of evaluating the charges as to each distinct victim, based on its verdict acquitting Barbe on certain counts and convicting him on others. As a result, we award habeas corpus relief to Barbe only on his six convictions relating to J.M. (Counts Two, Three, Five, Six, Eight, and Nine). We deny any such relief on Barbe's convictions relating to B.H. (Counts Ten and Eleven).[25]

### III.

Pursuant to the foregoing, we affirm the district court's denial of habeas corpus relief on the Ineffective Assistance Issue, vacate its denial of relief on the Confrontation Issue as to the six convictions involving J.M., affirm its denial of relief on the Confrontation Issue as to the two convictions involving B.H., and remand for the issuance of a writ that is consistent herewith.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

---

[25]Although we vacate the district court's denial of relief as to the convictions involving J.M., we leave intact Barbe's convictions involving B.H. and his sentence thereon, which appears to be an aggregate term of 20 to 50 years. *See supra* note 10.