**Delvin WHITE, Petitioner, Appellant,**

v.

**Jane COPLAN, Warden, New Hampshire State Prison, Respondent, Appellee.**

**No. 04–1044.**

United States Court of Appeals, First Circuit.

Heard Aug. 6, 2004.

Decided Feb. 18, 2005.

---

David M. Rothstein, Deputy Chief Appellate Defender, Appellate Defender Pro-

gram, with whom Behzad Mirhashem, New Hampshire Public Defender, was on brief for petitioner.

Andrew R. Schulman and Getman, Stacey, Schulthess & Steere, P.A. on brief for New Hampshire Association of Criminal Defense Lawyers, Amicus Curiae.

Nicholas P. Cort, Assistant Attorney General, Criminal Justice Bureau, with whom Peter W. Heed, Attorney General, was on brief for respondent.

Before BOUDIN, Chief Judge, TORRUELLA, Circuit Judge, and SARIS,* District Judge.

BOUDIN, Chief Judge.

In 1997, following a jury trial in New Hampshire Superior Court, Delvin White was convicted of three counts of sexual assault against two young girls and sentenced to a term of 30 to 90 years' imprisonment. At trial he was forbidden to offer evidence that both girls had previously made such accusations against other persons, even though the state supreme court ultimately found that such prior accusations showed a reasonable probability of falsity. In this habeas appeal, White pursues his claim that this restriction violated his confrontation clause rights.

Some core facts are undisputed. On March 2, 1996, White visited his friend Wayne and Wayne's girlfriend Marguerite at Wayne's apartment. Also present were Wayne's two daughters, ages eight and twelve, and Marguerite's two sons, 14–year-old Danny and her one-year-old infant. After dinner the two men played cards for a while but White spent most of the evening playing and watching television with the children in the playroom, except for trips out with Wayne to buy beer and provisions. There was evidence that each of the men drank in excess of a six-pack during the visit.

At around 9:00 p.m., Marguerite put the older girl to bed; the younger continued to watch television with Danny and White in the playroom. At 9:30, the younger daughter went to Marguerite and Wayne in the living room and told them that White had put his hand in her nightshirt and placed his finger on her "private." Wayne immediately attacked White, who responded by shouting a denial. During the confrontation, the older girl came out of her bedroom crying hysterically; Marguerite took all of the children to an upstairs neighbor's apartment and left them there while she went and called the police.

The police arrived shortly thereafter and one officer spoke briefly with the younger girl about her alleged assault (the older one appeared too distraught to interview). At the suggestion of the police, a doctor at the local hospital examined both girls, who complained to him of sexual assault; but the examination provided no confirmation, nor did a police forensic examination of 14 items of clothing worn by White and the two girls on that evening. There was evidence that these negative findings did not necessarily disprove the assault claims.

Police officers interviewed the two girls separately the next day. The older girl claimed that in the living room White had rubbed her breast and later touched her vagina before going to the store and, in the playroom after his return, had twice attempted to touch her and at one point had inserted his finger in her vagina. The younger girl made similar claims as to the period after which her sister had gone to bed. Danny, who had been present in the playroom, later said that he had not seen any of these alleged events. Although the apartment was small and one room opened

* Of the District of Massachusetts, sitting by designation.

into another, neither Wayne or Marguerite claimed to have witnessed the touchings.

White was tried three times, the first two cases ending in mistrials. In the third trial, as in the first two, the only direct evidence of the assaults came from the two girls. The forensic evidence was negative. Danny's version of events was helpful to White, and Marguerite and Wayne, who also testified, had not seen the assaults. The doctor and various police officers who testified had no direct knowledge but only the girls' own version.

White did not testify; quite possibly he feared cross-examination on his own criminal record, which included at least two instances of sexual misconduct in the 1970s. He relied instead on Danny's testimony and on cross-examination of the two girls, designed to elicit inconsistencies within their stories and between them. He also suggested that the girls were alarmed by the extent of their father's drinking with White (Wayne had previously gone to prison for drinking-related offenses) and had sought their father's attention by making up the story of the assaults.

The prosecution agreed that its case was based on the theory that "these kids are telling the truth" and that the defense's case was based on the proposition that "[t]he kids are lying." Towards the very end of closing, the prosecutor asked rhetorically whether it would be "human nature to tell a horrific, huge lie against a stranger"; called the girls' truthfulness "the heart and soul of this case"; and suggested that they had "no motivation" and "no reason" to lie.

The third trial started with seven counts against White. Two were dismissed by the trial judge as inconsistent with the indictment and the jury deadlocked on two others—both for aggravated felonious assault based on the charges of digital penetration. The jury convicted, however, on two charges of ordinary felonious assault based on touchings of both of the girls' breasts and one charge of aggravated felonious assault for touching the outside of the older sister's vagina. The state's supreme court affirmed, considering and rejecting the constitutional claim now pursued in federal court.

The claim revolves around cross-examination and backup evidence that White sought to employ at trial. Specifically, White sought to cross-examine both girls about prior accusations of sexual assault that they had made against three individuals: a neighbor whom both girls had accused of sexually assaulting them in 1993, and who had been acquitted by a jury of the charges in 1994; a cousin whom the older girl had accused of sexually assaulting her, but against whom charges were never brought; and another individual named "Mac" whom the older daughter had accused of sexually assaulting her but who was never identified by the police.

White claimed that all of these prior allegations were false and pointed to evidence available to support that claim if the girls denied making prior false accusations. With regard to the two girls' charges against their neighbor, White proffered the neighbor's verdict of acquittal; testimony from two witnesses at the 1994 trial claiming that the older girl had admitted to her mother and her mother's then-boyfriend that the original accusations were a lie; and various law enforcement reports of the incident from the younger girl that described the alleged assault inconsistently over time.

White also proffered testimony from the 1994 trial suggesting that the older girl had admitted the accusations against her cousin were a lie, and supplemented this proffer with reports from a police investi-

gation into the incident that was eventually terminated due to a finding of reasonable doubt and inconsistencies between the girl's claims and background facts collected by the police officer assigned to the case. The only evidence as to falsity of the accusations against "Mac" was law enforcement's failure to identify anyone fitting his description; how thorough an investigation occurred is unclear.

In his motion *in limine*, White pointed to the similarity between the younger girl's accusations against her former neighbor and those against White (both claims involved an older man who had, in her words, "put his finger inside her private" and "reached over with one hand and rubbed her private" while sitting next to her on a couch) and a somewhat weaker congruence between the older girl's accusations against "Mac" and hers against White (both touching the outside skin of her vagina). White sought both to cross-examine the girls about their prior accusations and supposed recantations and, if the girls stood by their prior accusations, to offer the extrinsic evidence described above.

White argued in a pretrial hearing that the evidence bore upon credibility and showed prior sexual knowledge.[1] The trial judge ultimately prohibited all inquiry into the prior allegations. He said that so far as the evidence bore directly on credibility, New Hampshire law required such prior accusations to be "demonstrably false," which he said was not the case here; that the past and present allegations were similar only in generic terms; and that sexual knowledge could be shown by other means

(e.g., through the children's doctor) without the same prejudice and invasion of privacy.

In addition to requiring that the prior accusations be demonstrably false, the trial judge also relied upon a New Hampshire evidence rule, N.H. R. Evid. 608, which is the counterpart to Fed.R.Evid. 608. In both cases, the rule in pertinent part permits an attack on a witness' credibility by opinion or reputation evidence, with restrictions and "in the discretion of the court," by cross-examination of the witness directed to specific instances of conduct bearing on truthfulness—including instances of prior untruths. *See* 4 *Weinstein's Federal Evidence* § 608.22 (McLaughlin ed., 2d ed. rev.2004).

On White's state court appeal, White argued that the ban on the evidence violated his confrontation rights under both the federal and state constitutions. The state supreme court held that White had proven the falsity of the girls' earlier accusations to a "reasonable probability," but it concluded that New Hampshire law required a higher standard for prior accusations—demonstrable falsity—which the court equated with clear and convincing evidence.[2] *State v. White*, 765 A.2d 156, 159, 161 (N.H.2000). This view reflects New Hampshire case law rather than any specific language in Rule 608.

As to the constitutional claims, the court held that this limitation did not offend provisions of the state constitution granting the right to produce "all proofs that may be favorable" and the right to cross-examination. Saying merely that the fed-

---

1. The hearing and a detailed ruling took place incident to the second trial. At the third trial, the same ruling was made summarily by reference to the earlier ruling.

2. The state supreme court did not distinguish among the three prior accusations in holding

that White had proven their falsehood to a "reasonable probability." The evidence of falsehood for first two accusations is stronger than that against "Mac," but the state court may well have thought the evidence of each charge's falsity to reinforce that of the others.

eral constitution provided no greater protection, the state court also rejected White's own brief reliance upon the federal constitution. White's petition for certiorari to the U.S. Supreme Court was denied. *White v. New Hampshire,* 533 U.S. 932, 145 N.H. 544, 121 S.Ct. 2557, 150 L.Ed.2d 722 (2001).

White then brought the present habeas action in the federal district court in New Hampshire, where it was submitted by consent to a magistrate judge. The magistrate judge first held that the New Hampshire clear and convincing standard was unconstitutional under the Sixth Amendment because it imposed "an unduly high barrier" to probative defense evidence, *White v. Coplan,* 270 F.Supp.2d 178, 188 (D.N.H.2003); but on the state's motion to reconsider, the magistrate judge denied the habeas petition, saying he had been mistaken in taking a *de novo* view of the matter. *White v. Coplan* (*"White II"*), 296 F.Supp.2d 46, 48–50 (D.N.H.2003).

This revised decision invoked the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides that a state court decision on a federal constitutional claim must be respected in a habeas proceeding unless it is contrary to, or an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d) (2000). The magistrate judge held that the state supreme court had adjudicated White's federal constitutional claim and that the state court decision could not be overridden under the AEDPA standard. *White II,* 296 F.Supp.2d at 50. He nevertheless granted a certificate of appealability on both issues. 28 U.S.C. § 2253(c) (2000); Fed. R.App. P. 22(b).

We agree with the magistrate judge that the AEDPA standard governs, but on the merits conclude that White has a constitutional claim. To trigger the AEDPA standard, the state court need not discuss the federal claim in any detail; we infer that the federal claim was considered if the state court rejects a counterpart state claim and then cites to a case holding that the federal constitution provides no greater protection. *McCambridge v. Hall,* 303 F.3d 24, 35 (1st Cir.2002) (en banc). However, in *McCambridge,* as this court emphasized, the state court was correct in its general assessment of the relationship between state and federal protections. *Id.*

Here, White argues that, in equating state and federal law, the New Hampshire court relied upon a number of state cases that dealt with the exclusion of prior accusations; but, White points out, these cases involved situations in which the evidence was ultimately subjected to a less stringent standard than demonstrable falsehood, or where cross-examination was permitted but extrinsic evidence excluded. On this basis, he says that the state court's equation of federal and state protections was itself mistaken so the AEDPA standard should not be applied to shelter its merits ruling.

AEDPA's policy is to provide deferential review where a state court has adjudicated the federal claim on the merits, and the state court did so in this case. A state court's reliance on arguably inapt prior precedents with related fact patterns may well bear on whether its application of federal law was "unreasonable"; but it is hard to see why the adjudication is less one "on the merits" because its reading of precedent may be faulted. Other circuits have taken a similar view, holding that a mere recognition and rejection of the federal claim without any further discussion still invokes AEDPA deference. *See Rompilla v. Horn,* 355 F.3d 233, 248 (3d Cir.) (collecting cases), *cert. granted sub nom., Rompilla v. Beard,* —— U.S. ——, 125 S.Ct. 27, 159 L.Ed.2d 857 (2004); *see also*

*Weeks v. Angelone,* 528 U.S. 225, 231, 237, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000).

Nevertheless, given the state court's concession that the falsity of the girls' prior accusations was reasonably probable and the similarity of those accusations to the present ones, we rule that on these facts the state court's decision was an "unreasonable application" of "clearly established Federal law, as determined by the [U.S.] Supreme Court." We start with the question of what is "clearly established" Supreme Court law and then turn to the state court's rule requiring demonstrable falsity as applied to the circumstances of White's case.

■ The Supreme Court has declared cross-examination an essential constitutional right for a fair trial, subject to "reasonable limits" reflecting concerns such as prejudice, confusion or delay incident to "marginally relevant" evidence. *Delaware v. Van Arsdall,* 475 U.S. 673, 678–79, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *see also Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). In a criminal case, restrictions on the defendant's rights "to confront adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.' " *Michigan v. Lucas,* 500 U.S. 145, 151, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) (quoting *Rock v. Arkansas,* 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

Such language, clear although general, calls for a balancing of interests depending on the circumstances of the case. Factors that the Supreme Court has deemed relevant are the importance of the evidence to an effective defense, *Davis v. Alaska,* 415 U.S. 308, 319, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); the scope of the ban involved, *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431; and the strength *vel non* of state interests weighing against admission of the

evidence. *See Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Even if a state rule of exclusion is generally defensible, as is New Hampshire's version of Rule 608, it may on particular facts be applied to produce an unconstitutional infringement. *See Lucas,* 500 U.S. at 152–53, 111 S.Ct. 1743.

■ In this case, White's evidence was not merely "general" credibility evidence. That label applies to the traditional proofs—offered through character or reputation witnesses and sometimes through proof of specific instances of misbehavior, especially prior convictions—to support an inference that the witness has a tendency to lie. Once a staple of trials, modern evidence rules like Fed.R.Evid. 608 and 609 have significantly restricted such evidence without totally precluding it in all cases. *See generally* 4 *Weinstein's Federal Evidence, supra,* §§ 608.02[3], 609.02.

The evidence in this case was considerably more powerful. The past accusations were about sexual assaults, not lies on other subjects; and while sexual assaults may have some generic similarity, here the past accusations by the girls bore a close resemblance to the girls' present testimony—in one case markedly so. In this regard the evidence of prior allegations is unusual.

If the prior accusations were false, it suggests a pattern and a pattern suggests an underlying motive (although without pinpointing its precise character). The strength of impeachment evidence falls along a continuum. That a defendant told lies to his teacher in grade school is at one end; that the witness was bribed for his court testimony is at another. Many jurors would regard a set of similar past charges by the girls, if shown to be false, as very potent proof in White's favor.

This "if," of course, is the heart of the matter. If the witness were prepared to admit on the stand that a prior accusation of similar nature was false, it is hard to imagine good reason for excluding the evidence. Prior admitted lies of the same kind in similar circumstances could powerfully discredit the witness. No time-consuming excursion beyond the witness would be required. Further, the accusation being conceded to be untrue, inquiry would not require the witness to admit to prior sexual activity or assault.

The difficulties arise when it is assumed that the witness will make no such admission of past lies. Then, other problems aside, the risk is presented of a substantial excursion by both sides into proof that the witness is or is not telling the truth as to a prior episode or even multiple episodes that are not the main subject of the trial. Confusion and diversion of effort from the main task are also matters of degree, but there was certainly some potential for both in the present case.

Yet cross-examination and extrinsic proof are two different issues. The ability to ask a witness about discrediting prior events—always assuming a good faith basis for the question—is worth a great deal. Imagine if White had been allowed to question the girls about their prior accusations, establish their similarity, and inquire into supposed recantations. The jury, hearing the questions and listening to the replies, might have gained a great deal even if neither side sought or was permitted to go further. Cf. Michelson v. United States, 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

White was accused of serious crimes—witness his sentence—and virtually everything turned on whether the two girls were to be believed. White had almost no way to defend himself except by impeachment. Danny's testimony was helpful to White but still negative: Danny could only say what he had not seen. Possible inconsistencies in the girls' testimony could be explained by stress and confusion. By contrast, cross-examination to show prior similar accusations by the girls, allegedly recanted in two of the three instances, could easily have changed the outcome.

There is no Supreme Court case directly on all fours, but AEDPA requires no such thing. It is enough if the Supreme Court's general principles can be discerned and if, respectfully but with confidence, we think that failure to allow the evidence on the facts before us would be an unreasonable application of those principles. We do so conclude in this case and both our approach and our conclusion are strikingly similar to the view taken by the Seventh Circuit in Redmond v. Kingston, 240 F.3d 590 (7th Cir.2001).

There, the defendant, a counselor at an institute for drug- and alcohol-abusing minors, was convicted of statutory rape of a 15–year old named Heather who said that the defendant had traded drugs for sex. The defense counsel sought to cross-examine Heather as to whether she had accused another man of rape 11 months before but later confessed to her mother that the charge had been partially false. The state court excluded this line of questioning as merely cumulative evidence going to credibility. Redmond, 240 F.3d at 590–91.

On habeas, Judge Posner accepted the AEDPA standard but held the exclusion an unreasonable application of the Supreme Court's confrontation clause doctrine. Judge Posner said that the evidence was highly probative and certainly non-cumulative because, unlike other available evidence bearing generally on credibility, it involved a similar prior accusation and its falsity implied a possible motive for a false charge against the defendant. See Redmond, 240 F.3d at 591–92; accord

*United States v. Stamper*, 766 F.Supp. 1396, 1400 (W.D.N.C.1991).

Evidence suggesting a motive to lie has long been regarded as powerful evidence undermining credibility, and its importance has been stressed in Supreme Court confrontation cases. *See Olden v. Kentucky*, 488 U.S. 227, 231, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (per curiam); *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431; *Davis*, 415 U.S. at 316–18, 320, 94 S.Ct. 1105. In our case the nature of the motive may be unknown; but if the prior accusations are similar enough to the present ones and shown to be false, a motive can be inferred and from it a plausible doubt or disbelief as to the witness' present testimony.

We are dealing here with something far more potent than "general credibility" evidence which, under confrontation clause standards, may have a lower status. *See Davis*, 415 U.S. at 316, 94 S.Ct. 1105; *id.* at 321, 94 S.Ct. 1105 (Stewart, J., concurring). Relying on the "general credibility" label, some circuit courts have declined to find confrontation clause violations where the judge excluded past accusations by the victim. Yet in one such case, *Boggs v. Collins*, 226 F.3d 728, 735 (6th Cir.2000), *cert. denied*, 532 U.S. 913, 121 S.Ct. 1245, 149 L.Ed.2d 152 (2001), a hearing had found that the charge of prior falsity—indeed, of any prior accusations whatsoever—was itself false; in a second, the defendant's proffered evidence of falsehood was extremely weak. *Quinn v. Haynes*, 234 F.3d 837, 847, 851 (4th Cir.2000), *cert. denied*, 532 U.S. 1024, 121 S.Ct. 1968, 149 L.Ed.2d 762 (2001).[3] *Redmond* is closer to our own facts.

We conclude that, on the present facts, White was entitled to explore the prior accusations on cross-examination. White has narrowed his claim on appeal to cross-examination, and we are not endorsing any open-ended constitutional right to offer extrinsic evidence. Such an excursion requires more witnesses and documents, and so greater risks of confusion and delay; to say that impeachment here would cast light on a motive to lie is not to suggest that prior false accusations are the kind of evidence for which extrinsic evidence has traditionally been admitted. *Compare United States v. Abel*, 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984).

Nor do we say that New Hampshire's requirement of demonstrable falsity is always and everywhere infirm. Indeed, speaking of this same restriction, we said in *Ellsworth v. Warden*, 333 F.3d 1, 6 (1st Cir.2003) (en banc), that a general constitutional challenge to the "demonstrably false" requirement would be "an uphill struggle"; and we noted that "the confrontation clause objection is pretty well limited to extreme cases where the state restriction is patently unreasonable." We continue to adhere to this view, holding that it is the *application* of New Hampshire's general rule to the peculiar facts of this case that violates the Constitution.

In *Ellsworth*, the defendant had in fact been permitted to cross-examine his accuser regarding prior false accusations and had been precluded only from introducing extrinsic evidence, *State v. Ellsworth*, 142 N.H. 710, 709 A.2d 768, 772–74 (1998), and our main concern was whether evidence pointing to *further* false accusations had been wrongly withheld. *Ellsworth* did not

---

**3.** In a third case it was quite doubtful whether the prior statement was false, and the prior accusation was somewhat dissimilar. *United States v. Bartlett*, 856 F.2d 1071, 1087–88 & n. 25 (8th Cir.1988). Also, *Bartlett's* treatment more resembles a balancing inquiry than a *per se* rule excluding general credibility evidence from confrontation clause protection. *See also Hughes v. Raines*, 641 F.2d 790, 792–93 (9th Cir.1981).

decide what would happen if the search disclosed such accusations that were false to a reasonable probability. The decision did note that "strong evidence of a prior false accusation," at least if the "setting and type of alleged lie are similar [to the present testimony]," would be "very powerful." 333 F.3d at 5.

We are concerned here with an attempt to pursue by cross-examination prior past accusations of a quite similar character to the present one; with a ruling—which is quite unusual—that the prior accusations (or at least two of them) were false to a reasonable probability; with a resulting plausible inference of a motive to deceive that could infect the present testimony of the two vital prosecution witnesses; and with a defendant who had virtually no other way to defend himself. This is the unusual situation and, to us, an "extreme case[ ]."

The judgment is *vacated* and the matter is *remanded* to the district court with directions to enter an order providing that White must be released unless—within a reasonable time to be fixed by the district court—he is afforded a new trial.

*It is so ordered.*