Kelly, C.J.
(dissenting). I respectfully dissent from the majority’s decision to deny leave to appeal in this case. Defendant sought to introduce at tried evidence that it was equally likely that another person committed the crime with which he was charged. The trial court’s refusal of his request violated defendant’s Sixth Amendment right of confrontation.[1]
Because the excluded evidence was so important and its exclusion undoubtedly tainted the verdict, I would reverse the conviction and remand the case for a new trial.
FACTS
Defendant, Ricky Parks, was convicted of two counts of first-degree criminal sexual conduct (CSC-I)[2] for molesting his nine-year-old stepdaughter, D.W[3] The allegations against defendant arose when D.W. told a school social worker that defendant had sexually abused her. D.W, a mentally challenged child, had been abandoned by her mother and left with defendant. She had suffered a closed head injury when she fell from a golf cart while living with her grandparents and was left with serious developmental problems.
*1053 Some years later, when D.W. was living with defendant, locks had to be put on the doors because she would leave the house naked. Her behavior at school had sexual overtones. When asked at home why she was misbehaving, D.W. answered that her grandfather used to bring her to his bed, touch her vaginal area, and have her touch his penis. She claimed that he put his penis in her mouth, as well as his fingers in her vagina. She referred to her grandfather’s penis as his “weenie” and described how, when she put it in her mouth, it “got sick on her belly.” D.W made some of the allegations against her grandfather after she was caught inappropriately fondling her brother. She then said that she was “trying to make medicine to wash his weenie off.”
Defendant and D.W’s mother obtained counseling for D.W. at school. They also reported the allegations D.W made against her grandfather to the Department of Social Services,[4] but no charges were ever brought against the grandfather. Records show that a protective services case was opened in 1996, prompted by allegations that D.W’s grandfather abused her. However, it was closed because D.W failed to disclose any abuse while talking to agency personnel.
Nonetheless, the social service caseworker concluded in 1996 that “the statements made to mother and step-father with detail indicate that this child has either been exposed to an extreme amount of sexual activity or that she has been abused in the past.” Also in 1996, an examining physician, Dr. Stephen Guertin, stated that the results of his examination of D.W. were normal, although he could not rule out fondling. That year, a complaint from the Department of Social Services revealed that D.W. “made a statement alleging that she touched her [grandfather’s] weenie when it got sick.” Following the 1996 investigation, defendant attempted to enroll D.W in counseling.
In 1998, D.W’s mother abandoned her and moved to the West Coast. Defendant took care of D.W In time, his girlfriend, Julie Sutliff, moved into his home. She observed D.W touching herself in the vaginal area, making inappropriate sexual comments, and misbehaving. D.W told Sutliff that touching herself was no big deal because her grandfather used to do it to her. She also told Sutliff that her grandfather used to molest her and that she would suck on his penis hard enough to “get medicine out of it.” Sutliff said that she did not contact law enforcement personnel because defendant told her that he had attempted earlier to get help from them with no result.[5]
At a preliminary examination in 2002, D.W. alleged that defendant had abused her. Her accusations were very similar to those she had made against her grandfather. She asserted that defendant had “put his weenie in my mouth” and then “[it] got sick.”
*1054 The prosecution presented no physical evidence of sexual abuse at trial. Defendant testified and maintained his innocence throughout the proceedings. D.W’s testimony was the only direct evidence of molestation brought against him. The prosecution bolstered D.W’s testimony by presenting evidence of her age-inappropriate knowledge of sexual matters and her continuous sexual behavior. The trial court prohibited defense counsel from cross-examining D.W about her prior allegations of assault by her grandfather.
The prosecution’s theory throughout trial was that D.W’s abnormal behavioral problems and age-inappropriate sexual knowledge was a “cry for help” for someone to save her from defendant’s molestation. In her opening statement, the prosecutor told the jury, “I don’t have a smoking gun or DNA evidence, but I do have D.W crying out for help,” demonstrated by her “inappropriate sexual knowledge” and “inappropriate sexual behavior.” The prosecution continued the theme of a cry for help by calling witnesses for the sole purpose of detailing D.W’s erratic behavior.
The prosecution called an expert qualified in the area of pediatrics with an emphasis on sexual abuse, Dr. Guertin, who examined D.W after the alleged abuse by defendant.[6] Dr. Guertin testified that his examination of D.W. showed no physical evidence of molestation, but, given D.W’s “history,” it was his opinion that she had likely been “fondled.”[7] Significantly, Dr. Guertin never gave an opinion about who had fondled D.W or what her “history” entailed.
The prosecution also called D.W.’s former elementary school teachers to testify about her disruptive behavior. The teachers recounted how D.W was “a handful” at school. She would throw temper tantrums so severe that all the other students had to be removed from the classroom until she calmed down. Sometimes she hit her head against the floor and screamed “I want to die.” She wrote letters to a boy in the class telling him she would have sex with him and “if you live with me I will have a baby.”
Other students were reluctant to be in the same room with D.W Once, D.W gyrated against a desk in a “humping” motion like a “dog in heat.” Another time, she took off her overalls and stood in the classroom in her underwear. One teacher recalled a time when D.W screamed “don’t fuck me” when the teacher tried to restrain her. In closing argument, the prosecution reminded the jury of D.W’s behavior, claiming that D.W was crying for help because of what was going on in her house. The prosecutor argued that, through her behavior, D.W was yelling out “make this stop.” The prosecutor systematically used D.W’s behavior as proof that it was defendant who molested her.
*1055 THE RAPE-SHIELD ACT vs THE CONSTITUTIONAL RIGHT OF CONFRONTATION
In limited situations, the admission of evidence of a victim’s past sexual conduct may be not only relevant but required to preserve a defendant’s constitutional right to confrontation.[8] The trial court must balance the legitimate competing interests of the state and the accused on a case-by-case basis.[9] The United States Supreme Court has identified specific factors that need to be considered: (1) the strength vel non of state interests weighing against admission of the evidence,[10] (2) the importance of the evidence to an effective defense,[11] and (3) the scope of the ban on the evidence.[12]
In this case, the importance of the proposed evidence to an effective defense overwhelmed any state interest. Defendant was charged with two counts of first-degree criminal sexual conduct (CSC-I), a very serious crime.[13] A determination of his guilt hinged on whether the jury believed DW or him; it came down to a credibility contest between the two.
Beginning with her opening statement, the prosecutor used D.W.’s age-inappropriate knowledge and sexual behavior as proof that D.W was telling the truth. Almost all the state’s witnesses testified for the purpose of establishing DW’s abnormal behavior. By not allowing defendant to offer an alternative plausible explanation for DW’s behavior, he was left without a defense. By barring evidence that DW. had been abused by her grandfather, the trial court kept from the jury a critical piece of the puzzle necessary for the jury to render a fair decision. There was no direct physical evidence tying defendant to the alleged assaults, and DW was inconsistent in describing the details of the alleged assaults. Yet, without an alternative explanation for DW’s age-inappropriate sexual knowledge and abnormal behavior, the jury was led directly to the conclusion that defendant was the one who committed the acts.
Furthermore, the evidence was pertinent and necessary to the defense because of the similarity between DW’s description of the alleged sexual abuse by defendant and her grandfather. D W testified at the preliminary *1056 examination that defendant “put his weenie in my mouth” and then “[i]t got sick.” This language is nearly identical to the statements she allegedly made against her grandfather. The 1996 social services report indicated that D.W said that she “touched her [grandfather’s] weenie when it got sick.” This is similar to D.W’s telling defendant’s girlfriend that her grandfather made her perform oral sex on him until “medicine” came out. It is extremely unlikely that both defendant and D.W’s grandfather abused D.W in the same manner and used the same peculiar language to describe the incidents.[14]
Moreover, the initial abuse had to have occurred before 1996. Because, by 1996, D.W had already described acts of oral sex and a “weenie” getting “sick,” with a liquid being ejaculated, which she referred to as “medicine.” However, defendant was charged with abuse that allegedly occurred sometime between 1999 and 2000. At trial, D.W could not remember the time of year, time of day, or day of the week of the first assault. Evidence that D.W was molested before 1996 was relevant to show that D.W may not have been abused in 1999 or 2000. If that is the case, defendant is innocent of the charges brought against him in this case.
Finally, the evidence of prior sexual abuse was essential to put Dr. Guertin’s testimony in proper context. Dr. Guertin was the only expert in child sexual assaults to testify at trial. He stated that, on the basis of D.W’s “history,” she had likely been fondled. The evidence at trial suggested to the jury that the only person who might have fondled D.W. was defendant. Hence, it was essential for defendant to be able to show that the “history” on which Dr. Guertin based his conclusion included sexual abuse by another person. Without that knowledge, the jury was left with no viable explanation for Dr. Guertin’s testimony that did not implicate defendant. Other courts reviewing applications of a rape-shield act have found a defendant’s constitutional rights to have been imper-missibly violated in similar circumstances.[15]
*1057 Defendant’s guilt was a question of fact to be decided by an informed jury. If the jury had disbelieved D.W.’s testimony, the prosecution would have had no case. No other evidence linked defendant to the crimes. The jury was left without critical pieces of evidence to evaluate D.W’s testimony, and this effectively rendered defendant defenseless. The trial court erred by refusing to allow defendant to develop evidence about the prior allegations of sexual abuse by D.W’s grandfather. The error was not harmless beyond a reasonable doubt.
CONCLUSION
There are limited situations where the rape-shield act is irreconcilable with a defendant’s Sixth Amendment rights. In those situations, the statute must yield to a defendant’s constitutional rights of confrontation and to a fair trial. When the rape-shield act and a defendant’s rights of confrontation conflict, the trial court must balance the state’s interest in protecting the victim against the importance of the evidence to the defense.
In this case, the trial court violated defendant’s rights by barring all evidence that D.W’s grandfather had previously sexually abused her. Defendant’s defense was critically impaired when he was prevented from showing an equally plausible alternative explanation — that the child’s grandfather had abused her in the past. Defendant is entitled to a new trial. Therefore, I dissent from the denial of leave to appeal.

 US Const, Am VI.

 MCL 750.520b(1)(a).

 I refer to the complainant as D.W to protect her identity.

 The Department of Social Services no longer exists. Its present equivalent is the Department of Human Services.

 DW’s grandfather lived out-of-state when the 1996 investigation took place, which may explain why nothing ultimately came of the investigation.

 The jury was never permitted to hear that Dr. Guertin had examined D.W four years earlier for signs of sexual abuse allegedly committed by her grandfather.

 When eliciting testimony, the prosecutor specifically instructed Dr. Guertin not to explain the “history” of abuse on which he based his opinion.

 People v Hackett, 421 Mich 338, 348 (1984).

 Id. at 349. Hackett instructs that the trial court should use the in camera hearing process to evaluate Confrontation Clause problems involving the rape-shield act’s bar of normally relevant evidence. This process is found at MCL 750.520j(2); see also Michigan v Lucas, 500 US 145, 153 (1991).

 Chambers v Mississippi, 410 US 284, 295 (1973).

 Davis v Alaska, 415 US 308, 319 (1974).

 Delaware v Van Arsdall, 475 US 673, 679 (1986). See White v Coplan, 399 F3d 18, 24 (CA 1, 2005) (listing factors to be considered); see also Barbe v McBride, 521 F3d 443, 458 (CA 4, 2008).

 CSC-I carries a maximum sentence of life in prison. MCL 750.520b(2).

 In his concurring statement, Justice Young appears to misunderstand the point I make here. I am not suggesting that D.W’s behavior encouraged someone to sexually abuse her. Far from it. I am suggesting that D.W.’s description of the alleged abuse was first made before the dates on which defendant is alleged to have abused her. Hence, the abuser, if there was indeed one abuser, was not defendant, and the jury was never allowed to learn the facts that lead to that conclusion. Unless defendant abused D.W. in the same manner and using the same peculiar language as a prior abuser employed, D.W’s age-inappropriate sexual acting out could have been occasioned solely by abuse she suffered by someone other than defendant.

 See, e.g., McBride, 521 F3d 443 (concluding that the defendant had a constitutional right to introduce evidence of past sexual abuse of the child-victim to provide an alternative explanation for the child’s psychological profile); United States v Bear Stops, 997 F2d 451, 457 (CA 8,1993) (holding that the defendant’s constitutional rights were violated when he *1057 was prohibited from introducing evidence that the six-year-old complainant had been sexually assaulted previously because the evidence “provide[d] an alternative explanation for the prosecution’s persuasive evidence about [the victim’s] behavioral manifestations of a sexually abused child”).