TORRUELLA, Circuit Judge (Dissenting).
The specter of an adult, particularly one in a position of trust such as a stepfather, sexually abusing his minor stepchildren is enough to incense even the most equanimous person and to wish upon such a miscreant the full retributive weight of the law. But there lies the catch: the law. We live in an ordered society, and to keep it ordered for the benefit of the whole of society, we are bound to apply the law, not just to do what we believe the abominable person charged may justly deserve.[10]
Our Constitution, as our “supreme law,”[11] establishes the minimum rights to which a person accused of a crime is entitled in defense of his life and liberty. There are virtually no exceptions to the attachment of these rights by reason of the nature of the crime charged, even for the most heinous of accusations. Such is the situation with which we must wrestle in this appeal. Succinctly put, we are required to determine whether the New Hampshire courts unreasonably applied clearly established federal law designed to protect Abram’s right to cross-examine his accusers.
“The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution ‘to be *54 confronted with the witnesses against him.’ ” Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). An essential element of this right, as recognized by the Supreme Court, is the right to cross-examine adverse witnesses. Id. at 678-79, 106 S.Ct. 1431. However, as the Court has stated, this is not an absolute right: trial courts may place reasonable limits on cross-examination “based on concerns about, among others things, harassment, prejudice, confusion of the issues, the witnesses]’ safety, or interrogation that is repetitive or only marginally relevant.” Id. at 679, 106 S.Ct. 1431. Our inquiry should therefore be directed at determining whether the New Hampshire trial court’s restrictions on the petitioner’s right to confront the witnesses against him are properly within these constitutional parameters.
Because I cannot in good conscience find that the trial court’s ruling in this case reasonably applied established federal law when considering the petitioner’s Sixth Amendment rights and because the court engaged in no perceptible balancing of the considerations required under White, I am forced to conclude that the petitioner in this case is entitled to the habeas relief he seeks. See White v. Coplan, 399 F.3d 18, 24 (1st Cir.2005) (finding that prohibiting defendant from cross-examining accusers regarding prior accusations of sexual assault was an “unreasonable application” of “clearly established Federal law” and noting that Supreme Court precedent requires a balancing of interests).
The facts are straightforward and are not in dispute. Petitioner Scott Abram married Evelyn Towne in 1997 and settled in Manchester, New Hampshire. Towne brought three children from a prior marriage to this union, A.A., C.A., and K.A. Thereafter, Abram and Towne procreated two children of their own, J.T. and M.T.
Sometime in 1999, while the family still resided in Manchester, A.A. and C.A. made allegations to their mother that Abram was sexually abusing them. Within two weeks of their giving formal statements to the Manchester police describing the alleged abuse, however, the mother called the police to say that the children— first C.A. and then A.A. — had recanted. The authorities proceeded no further with these matters.
In A.A.’s 1999 statement to the Manchester police, she claimed that she had “heard [M.T.] and [K.A.] molested in the bathroom[, and] that she had seen the defendant do it one time to [K.A.] in 1999.” Notwithstanding these allegations, both M.T. and K.A. consistently denied that Abram penetrated their anuses. Furthermore, a physical examination of these children by physicians acting at the request of the authorities failed to reveal any evidence of sexual abuse, although the doctor opined that a negative result of this examination did not necessarily rule out the possibility of sexual abuse having taken place. The record shows that M.T. and K.A. were three and four years of age, respectively, when the 1999 incident allegedly took place.
In 2002, the family moved to Concord, New Hampshire. In November 2002, when A.A. was thirteen and C.A. was eleven, they renewed their accusations against Abram, claiming long-term sexual abuse. They alleged that Abram had sexually assaulted them by anally penetrating them. A.A. also accused Abram of engaging in vaginal intercourse with her and of forcing her to engage in sexual conduct with C.A. During the investigation that ensued, A.A., in a written statement to investigator Paula Fanjoy, renewed her 1999 accusations against Abram, including the related claims “that she saw her brothers [M.T. and K.A.] in the bathroom with [Abram] *55 and saw him place his penis in their butts.” A.A. then stated that “she saw blood on [M.T.’s] diapers three years ago,” in 1999. Medical records from 2002 showed that the children’s mother reported that C.A., K.A., and M.T. frequently complained of anal pain.
A.A.’s and C.A.’s allegations resulted in Abram’s arrest and indictment on charges of aggravated sexual assault and related offenses covering the time period between November 2000 and November 2002. The government again did not pursue any charges based on the renewed 1999 allegations.
Before trial, the government filed a motion in limine seeking to preclude Abram from eliciting any testimony from A.A. and C.A. regarding their claims that Abram had abused K.A. and M.T. in 1999. In doing so, the government anticipated that, for the purpose of impeaching A.A.’s and C.A.’s credibility before the jury during his cross-examination, Abram would raise the fact that A.A. and C.A. had made these accusations, notwithstanding that K.A. and M.T. had denied that Abram sodomized them. It was the government’s position at this hearing that the court should not permit any questions on this subject because Abram could not establish the falsity of A.A.’s and C.A.’s allegations to the requisite level under New Hampshire law.
New Hampshire law requires a showing that prior false allegations of sexual abuse are “demonstrably false” before an alleged victim of sexual assault can be cross-examined about prior allegedly false sexual abuse. See State v. Gordon, 146 N.H. 258, 770 A.2d 702 (2001) (overruled on other grounds by State v. Miller, 155 N.H. 246, 921 A.2d 942, 947 (2007) (overruling Gordon to the extent it “require[d] a defendant to demonstrate clearly and convincingly that the prior allegations were false before being permitted to cross-examine the victim about them under Rule 608(b),” but affirming that there is no constitutional requirement to permit this cross-examination unless the prior allegations were proved to be demonstrably false)). The New Hampshire Supreme Court has interpreted “demonstrably false” to require the defendant to prove that the allegations were “clearly and convincingly untrue.” State v. White, 145 N.H. 544, 765 A.2d 156, 159 (2000).
The trial court granted the government’s motion and enjoined Abram from asking any questions on cross-examination about the allegations and withdrawals concerning K.A. and M.T. The trial court in essence found that Abram’s allegations did not meet the New Hampshire “demonstrably false” test because (1) the medical examinations of K.A. and M.T. neither proved nor negated sexual abuse, (2) M.T. later recanted his initial denial of sexual abuse, and (3) the temporal inconsistencies in A.A.’s expected testimony did not clearly indicate that the allegations were false.
The case proceeded to trial before a jury, which found Abram guilty of twenty-one counts of felonious sexual assault, four counts of endangering the welfare of a child, and one count of indecent exposure and lewdness. The trial court sentenced Abram to 50 to 100 years of imprisonment. For reasons not relevant to this appeal, the New Hampshire Supreme Court reduced this sentence to thirty to sixty years of imprisonment when it vacated nine of the twenty-seven total counts for which Abram was convicted. The New Hampshire Supreme Court affirmed the trial court’s ruling prohibiting any cross-examination on the issue of A.A.’s and C.A.’s 1999 allegations regarding K.A. and M.T. See State v. Abram, 153 N.H. 619, 903 A.2d 1042 (2006). A petition for habeas corpus in the U.S. District Court for the District of New Hampshire alleging viola *56 tion of Abram’s Sixth Amendment rights fared no better, and this appeal ensued thereafter.
This case presents a quintessential credibility case. There was a dearth of physical evidence to prove the government’s case against Abram. The majority of the evidence against Abram consisted of the testimony of the obviously compelling witnesses he allegedly abused, in which they related evidence which, if true, would incense even the most detached and coldblooded juror. The accusers’ testimony was pitted against Abram’s denial that those incidents took place. The case, and Abram’s freedom, turned entirely on the word of the alleged victims against Abram. It was thus imperative that the defendant be allowed to test the reliability of the government’s witnesses in any reasonable manner. “The importance of the right of cross-examination is heightened when the testimony of the witness in question is the only evidence directly linking the defendant to the crime.” Searcy v. Jaimet, 332 F.3d 1081, 1093 (7th Cir.2003) (Cudahy, C.J., dissenting) (citing Olden v. Kentucky, 488 U.S. 227, 233, 109 S.Ct. 480, 102 L. Ed.2d 513 (1988); Davis v. Alaska, 415 U.S. 308, 317-20, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).
Abram sought to introduce evidence to show motive or bias which included the fact that A.A. and C.A. made prior allegations that Abram had abused their younger siblings, K.A. and M.T. (the “uncharged allegations”), that both K.A. and M. T. denied that Abram abused them, and that Abram was never charged for this alleged abuse. Federal case law distinguishes between general attacks on a witness’s credibility (evidence offered to support the inference that the witness has a tendency to lie) and attacks on credibility aimed at showing “possible biases, prejudices, or ulterior motives of the witness.” Davis, 415 U.S. at 316, 94 S.Ct. 1105. “[W]hile ‘generally applicable evidentiary rules limit inquiry into specific instances of conduct through the use of extrinsic evidence and through cross-examination with respect to general credibility attacks, ... no such limit applies to credibility attacks based upon motive or bias....’” Redmond v. Kingston, 240 F.3d 590, 593 (7th Cir. 2001) (quoting Quinn v. Haynes, 234 F.3d 837, 845 (4th Cir.2000)); White, 399 F.3d at 26 (“Evidence suggesting a motive to lie has long been regarded as powerful evidence undermining credibility, and its importance has been stressed in Supreme Court confrontation cases.”). This case law does not imply that any time a defendant seeks to introduce evidence of prior false allegations to show the accuser’s bias or motive, the allegations are entitled to unconditional constitutional protection, regardless of the allegations’ veracity. The veracity of the allegations is relevant. In my opinion, in this case, Abram provided evidence of falsity to a reasonable probability.
The evidence regarding A.A.’s and C.A.’s 1999 accusations regarding their younger brothers would support the defense that the children were motivated to make false allegations about Abram in order to get him out of the house and to get away from his discipline, and were in fact so motivated that they were willing to “scorch the earth” to get him out. The uncharged allegations from 1999, if false, potentially show a pattern of false accusations against the same defendant. As we stated in White:
Many jurors would regard a set of similar past charges by [complainants], if shown to be false, as very potent proof in [the defendant’s] favor. This “if,” of course, is the heart of the matter.... [T]he risk is presented of a substantial excursion by both sides into proof that *57 the witness is or is not telling the truth as to a prior episode.... Yet cross-examination and extrinsic proof are two different issues. The ability to ask a witness about discrediting prior events — always assuming a good faith basis for the question — is worth a great deal. Imagine if [the defendant] had been allowed to question the [victims] about their prior accusations, establish their similarity, and inquire into supposed recantations. The jury, hearing the questions and listening to the replies, might have gained a great deal even if neither side sought or was permitted to go further.
399 F.3d at 24-25. Here, a pattern is not only suggestive of an underlying motive, it is even more so than what we, in White, considered suggestive because it shows the accusers’ potential animus against the defendant. See 399 F.3d at 24 (“If the prior accusations [regarding other men] were false, it suggests a pattern and a pattern suggests an underlying motive (although without pinpointing its precise character).”).
Further, the evidence of the uncharged allegations regarding the younger brothers is not cumulative of other evidence relevant to the accusers’ credibility. Although the evidence that A.A. and C.A. recanted their 1999 allegations regarding the alleged abuse they themselves endured supports the inference that the children have a propensity to lie, it does not show the extent to which they were willing to go in their attempt to get Abram out of the house or escape his presence. The children’s extraneous efforts in making false allegations regarding their younger brothers are relevant to show their animus toward the defendant. Abram was entitled to a higher level of constitutional protection because the evidence of the uncharged allegations was essential to show A.A. and C.A.’s potential motive and animus toward the defendant. See Redmond, 240 F.3d at 593 (noting that credibility attacks based upon motive or bias are not subject to the limitations of generally applicable evidentiary rules). Given that the trial court failed to consider the argument that the evidence was relevant to the children’s bias or motive, I find that it unreasonably applied federal law.
A.A.’s and C.A.’s 1999 uncharged allegations regarding their younger brothers are especially relevant and should have been allowed as a subject of controlled cross-examination. But the trial court went even further, and barred any cross-examination on this crucial subject. The facts here, like the facts in White, present an extreme case where the trial court should have extended the protections of the Sixth Amendment regardless of the petitioner’s ability to meet New Hampshire’s “demonstrably false” standard.[12]
First, the circumstances surrounding the uncharged allegations are similar in nature to A.A.’s and C.A.’s allegations against Abram in 2002. See White, 399 F.3d at 24 (concluding that the evidence was considerably more powerful than general credibility evidence where the past accusations bore a marked resemblance to the accusers’ allegations against the defendant). Both the 1999 and 2002 allegations were made on the heels of an argument between A.A. and Abram, who was a strict disciplinarian, and during periods of time coextensive with the periods during which A.A. and C.A. claimed that Abram engaged in their “long term sexual abuse.” Further, they involved minor children of the same *58 household, all of whom were under Abram’s custody and control.
Second, there is a temporal proximity between the 1999 accusations and the 2002 accusations, during the latter of which A.A. renewed the previously recanted accusations she and C.A. made in 1999. If the children lied about the 1999 accusations, then it makes it more likely that they would lie again just a few years later. Third, although the police knew about both the accusations in 1999 and the renewal of the same in 2002, no charges were filed against Abram regarding the 1999 allegations. The failure to prosecute Abram for the 1999 allegations at a minimum raises the possibility that the government did not find them credible in view of the fact that the children recanted the allegations or that the government strategically considered that cross-examination on that point would damage A.A.’s and C.A.’s credibility.
Fourth, there was evidence that A.A. did not like being in the Abram household because Abram and her mother argued often (the 2002 charges resulted in A.A. and her brother being moved to live with relatives). The fact that A.A. disliked being in the household is relevant to her possible motive for lying repeatedly about the accusations, as she could have either sought to remove Abram from the household or, in the alternative, get herself sent away. Finally, the striking similarities between the various allegations in Abram’s case and their importance to his defense provide us with facts that are at least as extreme as those we had in White.
The trial court’s absolute ban, and the Supreme Court of New Hampshire’s affirmation of this ban, is an unreasonable application of clearly established federal law. A restriction on cross-examination, when appropriate,
[cjalls for a balancing of interests depending on circumstances of the case. Factors that the Supreme Court has deemed relevant are [1] the importance of the evidence to an effective defense, [2] the scope of the ban involved and [3] the strength vel non of state interests weighing against admission of the evidence.
White, 399 F.3d at 24 (numbered brackets supplied). Here, the court failed to consider the balancing required under White and focused only on examining whether the facts in Abram’s case were identical to those in White. See State v. Abram, 903 A.2d at 1053-54. In failing to balance the interests that White and established federal law call for, the trial court unconstitutionally weighted the scales in favor of the government’s interest and unreasonably applied established federal law.
I would reverse the district court’s denial of relief.

. As Sir Thomas More stated, “[G]ive the devil benefit of law.” Robert Bolt, A Man for All Seasons: A Play in Two Acts 66 (First Vintage Int’l ed., Vintage Books 1990) (1960).

. U.S. Const, art. VI, cl. 2. ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby....”).

. Although this Court has stated that a constitutional challenge to this standard would be an "uphill struggle," we have yet to address such a challenge. See Ellsworth v. Warden, 333 F.3d 1, 6 (1st Cir.2003).